UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

ROGER D. HARRIS,          )
                                )
        Petitioner,        )
v.                           )      No. 2:05-CV-24
                                )      *Greer/Inman*
HOWARD CARLTON, Warden,   )
                                )
        Respondent.     )

# M E M O R A N D U M

Roger D. Harris ("Harris" or "petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 1991 state court convictions [Court File No.1]. Howard Carlton ("respondent"), Warden of the facility where Harris is housed, has filed a motion for summary judgment [Court File No. 7].

After considering the filings of petitioner and respondent, the record of the state proceedings, and the applicable law, the Court will **GRANT** respondent's motion for summary judgment [Court File No. 7] and **DISMISS** petitioner's § 2254 petition [Court File No. 1].

## I.     STANDARD OF REVIEW

A state criminal defendant may obtain federal habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Proceedings in the United States Districts Courts, the Court is to determine,

after a review of the entire record, whether an evidentiary hearing is required. After carefully reviewing the record, the Court finds it unnecessary to hold an evidentiary hearing.

Under 28 U.S.C. § 2254(d), which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a writ of habeas corpus for any claim adjudicated on the merits in state court unless the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. In addition, state court factual findings are to be presumed correct unless the petitioner offers clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).

Ordinarily, when a state court issues an order denying relief without discussing the applicable law, this Court must "'conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.'" *Brown v. Pitcher*, 19 Fed.Appx. 154 (6th Cir.2001) (unpublished table decision), available in 2001 WL 700858, at *2,(quoting *Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001)), *cert. denied*, 534 U.S. 1057 (2001) . "'That independent review, however, is not a full, de novo, review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.'" *Palazzolo v. Gorcyca*, 244 F.3d

512, 516 (6th Cir.) (quoting *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001)), *cert. denied*, 534 U.S. 828 (2001). Credibility findings made by state courts are entitled to a presumption of correctness. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997), *overruled on other grounds* by *In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004), *judgment vacated* by *Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005); *Smith v. Jago*, 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990).

## II.    PROCEDURAL HISTORY

On June 27, 1991, Petitioner was convicted of first degree murder and reckless endangerment by a jury in the Criminal Court for Unicoi County, Tennessee. For those offenses, he received respective sentences of life and a concurrent two-years imprisonment. Petitioner filed a direct appeal to the Tennessee Court of Criminal Appeals, attacking only the murder conviction. The appellate court affirmed and Tennessee Supreme Court denied further review.[1]

On March 15, 1995, Petitioner filed a *pro se* petition for post-conviction relief in state court. Several interlocutory appeals followed before the post-conviction petition was finally heard on the merits and denied. The Tennessee Court of Criminal Appeals denied relief. Petitioner's application for permission to appeal was denied by the Tennessee Supreme Court

---

[1]        Petitioner's trial counsel did not initially seek permission to appeal to the Tennessee Supreme Court, but during petitioner's post-conviction proceeding, the court held that the petitioner was entitled to file a delayed request for permission to appeal. The Tennessee Supreme Court denied the application for permission to appeal.

on January 26, 2004.

## III.    FACTUAL BACKGROUND

The facts of the crime will be taken from the appellate court's opinion on direct review.  *State v. Harris*, 1992 WL 171368 (Tenn.Crim.App.1992).  The facts presented in the state post conviction hearing will be taken from the appellate court's opinion affirming the denial of petitioner's state post-conviction petition.  *Harris v. State*, 2003 WL 22174293 (Tenn.Crim.App. 2004).

### A.    Facts from the Criminal Trial

The facts, as related in the appellate court's decision, are as follows:

On December 21, 1990, the appellant's teenage girlfriend left him and moved in with another man, Jeff Higgins.  The appellant, a 36-year-old man, spent that night and the next day drinking, taking drugs, making threats against Mr. Higgins, and even shooting up his trailer home, injuring one of his friends.  At about eight o'clock in the evening, he went to Mr. Higgins's home and after a brief conversation with Higgins and the girlfriend, he pulled out a gun and emptied it into the victim's chest, face, thigh and stomach, killing him instantly.

There was testimony from Steve Lewis that the appellant and the victim actually met and spoke to each other calmly at least twice on the day in question prior to the fatal episode.  Mr. Lewis testified that he spoke with the appellant shortly after the killing and he seemed calm, coherent and sober. When Mr. Lewis told the appellant that he  heard he had shot the victim five times, the appellant responded, "No, it was nine times."  Mr. Lewis also testified that the appellant had stated earlier that day that he was going to "blow [the victim] away."

The appellant, testifying in his own behalf, claimed that he had no independent recollection of the incident.  He stated that he was too intoxicated to recall anything.

4

*State v. Harris*, 1992 WL 171368, at *1 (Tenn.Crim.App. 1992).

**B.      Facts from the Post-Conviction Hearing**

The testimony given at the post-conviction hearing, as summarized in the appellate

court's opinion, is set forth below.

> The petitioner testified that he was represented by the same trial counsel at his
> preliminary hearing, at trial, and on appeal. He said he asked his lawyer to file
> a motion for him to be released on bail, but his lawyer failed to do so. The
> State showed the petitioner an exhibit, which was a motion for the court to set
> bail for the petitioner prepared by the petitioner's trial counsel. The petitioner
> admitted that the motion was filed in his case by his trial counsel, but said he
> was not told why his motion was denied. He said he asked his attorney to
> appeal the trial court's decision denying him bond, and his attorney said the
> trial court denied his appeal. He said he wanted to be released from jail so he
> could work to help his family pay for his defense. He also said that being
> released from jail would have made it more convenient to meet with his
> attorney. He said that he never had the opportunity to meet his attorney in
> private and that they only met four times for five to fifteen minutes per
> meeting. He said that his attorney failed to show him any police reports,
> autopsy reports, lab reports, or photographs from the crime scene and that his
> attorney told him that he had talked with many witnesses and had done a
> thorough investigation. He said that he and his attorney did not discuss the
> hiring of any experts in his case and that his attorney told him that he had his
> own private investigator. He said that even though he gave his attorney the
> names of several potential witnesses, his attorney failed to interview any of
> them and the petitioner was the only defense witness. He said his attorney told
> him that nobody wanted to get involved in his case and testify on his behalf.
>
> The petitioner said that the word "intentionally" had been added to his
> indictment without his knowledge. He said his attorney told him that he
> planned to represent him before the Tennessee Supreme Court and never
> indicated that he did not plan to go forward on the petitioner's behalf. He said
> he told his attorney that he knew one of the jurors and that his attorney assured
> him "it'll be alright." He said that when asked, the juror denied knowing the
> petitioner.
>
> On cross-examination, the petitioner testified that he went to school with the
> juror and that she was a friend of the victim. He said he told his attorney that

the juror was a friend of the victim, and his attorney responded with, "I've got that."

The petitioner testified that every time he confronted his attorney about evidence and other things, his attorney would tell him that "your family has retained me, Mr. Harris, I've got this." He said that he wanted to see the search warrant and other documents, but his attorney did not give him a copy. He said that his attorney allowed law enforcement officers and jailers to stand within earshot of them during their meetings. He said he thought some of the jailers had "snitches," because the District Attorney said that inmates had claimed that he planned to plead temporary insanity. He said that no informants testified before the court.

On redirect, the petitioner testified that the longest meeting he had with his trial counsel lasted twenty minutes and that his family retained counsel for him because he was unable to financially do so himself. He said that on several occasions, his trial counsel failed to bring the petitioner's file or a notebook to their meeting.

Robert L. Harris, brother of the petitioner, testified that he was not on the scene when the victim was shot. He said that on the night of the incident, he was called to come to the scene to get the petitioner out from under the trailer. He said that he called to his brother, who came out from under the trailer and was handcuffed by police. He said that he was not interviewed by the petitioner's attorney and would have been able to remember more details if he had been interviewed back in 1990 or 1991. He said he did not testify at the petitioner's trial. On cross-examination, he testified that he had little contact with the petitioner after he was taken into custody. He said he did not contact the petitioner's attorney to tell him that he wished to testify nor did he attend the trial. He said that he would have been at his brother's trial if he had been subpoenaed even though, due to his own criminal record, he was advised by his own attorney not to attend.

Deborah Simmons, the petitioner's sister, testified that she was at her mothers home when she learned of the incident involving the petitioner. She said Investigator Don Whitson told her that her brother shot the victim and that all of the witnesses stated that the petitioner was drunk and "out of his mind." She said that she was involved in obtaining counsel for the petitioner and paid a portion of his fees. She said the petitioner's attorney did not ask her what she knew about the case. She said that she did not think about telling him about her conversation with Investigator Whitson until she heard him testify

in court that the petitioner was "straight" and "knew what was going on."

On cross-examination, Simmons testified that she asked Investigator Whitson if the petitioner had been drinking the night of the shooting because "if he was in his right mind he wouldn't have done something like that."

The petitioner's trial counsel testified that he has been an attorney for thirty-two years and that 95% of his practice consists of criminal work. He said that he was contacted by the petitioner's sister and was retained to represent the petitioner. He said he does not routinely give defendant's copies of motions nor does he remember the petitioner asking for copies of anything. He said he would not allow police officers to be within earshot of a conference with his client. He said that the provision for attorney/client conferences "weren't the best in the world" and that he would be mindful of security during any conversation with his client. He said that he did not remember the number of times he met with the petitioner, but the gist of the meetings had to do more with mitigating the offense than with an absolute defense. He said that "without a doubt there was an extremely high level of intoxication involved in the entire incident." He said his strategy was "to reduce the case from first degree murder to second degree murder based on the level of intoxication, attacking the element of premeditation." He said the petitioner's girlfriend had a relationship with the victim and had stayed with the victim on the night before the incident. He said that during the course of the day of the incident, the petitioner searched for his girlfriend, made threats, and got intoxicated. He said that he did not have any recollection of the indictment being altered to include the word "intentionally." He said he was fairly confident that if he objected to the amendment, the "court probably wouldn't have granted the motion, and we'd wound up with a continuance, and the case would have been resubmitted to the Grand Jury." He said he did not recall telling the petitioner he would file a Rule 11 appeal to the Tennessee Supreme Court, but he would have filed it had he told the petitioner he would do so. He said he did not see any reason for a mental evaluation of the petitioner and could not recall whether he used his own private investigator. He said that if the petitioner had said he knew someone on the jury, he would have seen that the potential juror was excused. He said the only issue he presented to the Court of Criminal Appeals was that the trial court erred in giving the requested jury instructions regarding intoxication and premeditation.

On cross-examination, trial counsel testified that he was unable to locate the petitioner's file and that, due to the passage of time, his memory about the case was vague. He said there was no issue that would have merited securing an

investigator, and he did not seek the help of any experts in the preparation of this case. He said he remembered talking to people who had seen the petitioner on the day of the incident. He said the trial court denied his request for bail, and he did not appeal its decision. He said he did not have any recollection about submitting motions in this case. He said he performs his own mental evaluation and relies on his training in "representing hundreds or thousands of clients." He said the petitioner's mental state may or may not have been admissible evidence, but he was aware of the petitioner's long history of drug and alcohol abuse. He said he did not remember sending a letter advising the petitioner that he would be responsible for filing his own Rule 11 application. On redirect-examination, he said the State's case was based on the assumption that the petitioner began forming the intent to kill many hours before he met the victim at about eight o'clock on the day of the incident.

Kent Garland testified that he was the prosecutor in the petitioner's case. He said that the petitioner's trial counsel "took a miserable set of facts and circumstances as far as the evidence that he had" to deal with and "tried to wear us out with it in the trial process." He said the facts in the case were overwhelming and he "couldn't imagine what possible defense that there might be available" to the petitioner. He said there was evidence of the petitioner's consumption of alcohol and marijuana over a period of time, which was an issue in the case. He said that every witness testified that the defendant had been consuming alcohol and marijuana during the day of the shooting. He said that Steven Lewis had been with the defendant on the day of the shooting and had testified to the defendant's consumption of alcohol. Garland said the defendant had a "nine shot .22 pistol" in his possession prior to the shooting and had shot Lewis in the foot after firing it inside his own trailer. He said Lewis testified that the defendant hid under this trailer. He said that when an indictment includes an error within the wording of first degree murder, an amendment is made before an indictment is read to a jury, and a change in the wording of an indictment is done prior to the beginning of trial. He said that the petitioner's trial counsel did not object to the amendment. He said the State did not offer to exclude anyone from the jury, and the defense used seven peremptory challenges, while the court used eighteen challenges. On cross-examination, he said there was never a death penalty notice in this case. He said the petitioner's trial counsel filed two pre-trial motions.

*Harris v. State*, 2003 WL 22174293 (Tenn.Crim.App. 2003), *perm. app. denied,* (Jan. 26, 2004).

## IV.    ANALYSIS

Petitioner raises three main grounds for habeas corpus relief:  ineffective assistance of counsel; denial of due process of law; and denial of a fair trial.  Each claim, along with its various sub-claims, will be addressed in order.

### A.    Ineffective Assistance of Counsel

### 1. **The Applicable Law**

Petitioner charges that his attorney gave him ineffective assistance at trial, as well as on appeal.  The criteria for determining whether a Sixth Amendment claim of ineffective assistance of counsel is meritorious is contained in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under the *Strickland* test, a petitioner must show two elements:  (1) that his counsel's performance was deficient, i.e., counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment, and (2) that the deficient performance resulted in prejudice to the defense, i.e., deprived the defendant of a fair trial rendering the outcome of the trial unreliable.  *Id*. at 687-88;  *McQueen v. Scroggy*, 99 F.3d at 1310-11;  *Sims v. Livesay*, 970 F.2d 1575, 1579-81 (6th Cir. 1992).  To show deficient performance, the petitioner must demonstrate that the attorney's representation fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88;  *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  *See also Flippins v. United States*, 808 F.2d 16, 17-18 (6th Cir.), *cert. denied*, 481 U.S. 1056 (1987).   There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689;  *Sims*, 970 F.2d at

1579-80. The Court cannot indulge in hindsight, but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690; *McQueen*, 99 F.3d at 1311. Trial counsel's tactical decisions are particularly difficult to attack. *McQueen*, 99 F.3d at 1311; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).

To establish the prejudice prong, petitioner must show that absent his attorney's errors, there is a reasonable probability that the result of his trial would have been different. *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *West*, 73 F.3d at 84, *quoting Strickland*, 466 at 691, *citing Smith v. Jago*, 888 F.2d 399, 404-05 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992), *cert. denied*, 508 U.S. 975 (1993), *see also West v. Seabold*, 73 F.3d at 84.

A defendant also is entitled to the effective assistance of counsel in his first appeal of right. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003). Appellate counsel's performance is judged under the same standard for evaluating trial counsel's performance. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003)

Ineffective assistance of counsel in a petition for habeas corpus review is a mixed question of law and fact. *West v. Seabold*, 73 F.3d at 84. This means that this Court will

defer to the state court's findings of fact, 28 U.S.C. § 2254 (e)(1); will not defer to its legal conclusions as to *Strickland*'s performance and prejudice components, since they present mixed questions of law and fact, *see Rickman v. Bell*, 131 F.3d 1150, 1153-54 (6th Cir. 1997), *cert. denied*, 523 U.S. 1133 (1998); but will bear in mind that "a federal court may not grant a writ of habeas corpus 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable.'" *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003) (*quoting Williams v. Taylor*, 529 U.S. 362, 411 (2000)), *cert. denied*, 540 U.S. 1164 (2004) .

2. **Discussion**

The Court turns now to trial counsel's alleged shortcomings.

     **a.**     **Trial Counsel**

Petitioner contends that trial counsel rendered ineffective assistance in twelve instances [Court File No. 1, at 18-19]. The Court will address each instance as petitioner addressed it in his petition, by grouping similar instances together.

     **i.**     **Motion Practice (Petitioner's sub-issue 1, 2, 7)**

Petitioner alleges several instances of trial counsel's failure to file motions under his claim of ineffective assistance of trial counsel. Specifically, he claims counsel failed to: (1) file a proper motion for bond (sub-issue 1); (2) file a motion to reconsider the denial of bond (sub-issue 2)and (3) file proper pre-trial motions (sub-issue 7).

In addressing Petitioner's allegations, the state court first observed that, although

petitioner claimed counsel should have filed a proper motion for bond, petitioner also asserted that after the trial court denied his motion for bond, counsel should have filed a motion to reconsider the denial. The state court adjudicated these issues as follows:

> There exists a constitutional right to bail in non-capital cases. *See* Tenn. Const. art. I, § 15; *State ex rel Hemby v. O'Steen*, 559 S.W.2d 340, 341 (Tenn.Crim.App. 1977). This was never a capital case because the State never sought the death penalty. The State concedes that the defendant was entitled to bail and that the petitioner's trial counsel erroneously failed to seek review of the denial of bail. The petitioner contends that, had he been released on bond, he would have been better able to confer with his attorney and helped in the preparation of his defense. However, the defendant failed to show that he was prejudiced by this and has not established how this would have affected the outcome of his trial. The post-conviction court found "there's nothing in the record that indicates that had he been released on bond any other evidence would have been produced, that the trial would have been in any way different." The petitioner fails to specify what pretrial motions, other than the aforementioned, his trial counsel was deficient in filing. Therefore, we can only conclude as to issues (1), (2), (3), and (7) that the petitioner has failed to show how he was prejudiced by his trial counsel's performance.

*Harris v. State*, 2003 WL 22174293, at *6.

Petitioner argues that the state court's decision adjudicating his claims of counsel's ineffective motion practice was erroneous because counsel caused an actual breakdown in the adversarial process in that he failed to subject the State's case to meaningful adversarial testing. Therefore, argues petitioner, the standard enunciated in *United States v. Cronic*, 466 U.S. 648, 659-62 (1984) (establishing a *per se* presumption of prejudice in very limited situations), is applicable to these claims and, thus, he need not demonstrate prejudice.

Petitioner is not entitled to relief on the first claim because it is controverted by the record. The record reflects that trial counsel filed a motion to set bail [Addendum 6, Exhibit

1, 2], which the trial court denied [Addendum 6, Exhibit 1, 3]. His attorney also filed a successful motion for discovery [Addendum 6, Exhibit 1].

Petitioner argues the state court decision was contrary to, and involved an unreasonable application of clearly established Federal law, *i.e., United States v. Cronic*, 466 U.S. 648 (1984), as determined by the Supreme Court because trial counsel's deficiency is clearly a situation where there was an actual breakdown of the adversarial process, thus no prejudice need be shown. According to petitioner, this is a case in which the standard of presumed prejudice discussed in *Cronic* should apply to these claims of ineffective assistance of counsel, as opposed to the inquiry into actual prejudice required by *Strickland*.

In *Cronic*, the United States Supreme Court created a narrow exception to the two-prong test in *Strickland*, establishing that, in limited circumstances, prejudice will be presumed. *United States v. Cronic*, 466 U.S. at 658-59. Where counsel is denied completely; where counsel, though present but prevented from assisting the accused during a critical stage of the proceedings, fails entirely to subject the State's case to meaningful adversarial assistance; or where the situation is such that there is a small likelihood that any attorney, even a fully competent attorney, could provide effective assistance. *Id*. at 659-62. Because circumstances like these make it "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," a petitioner need not show prejudice because a court must assume that prejudice has occurred. *Id.* at 658-59.

Petitioner does not suggest that the first and third situations apply here. Instead, he relies on the second circumstance in *Cronic* as support for his presumed-prejudice argument.

However, since the second situation arises only where "an attorney's failure is complete [and]... counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,"*Bell v. Cone*, 535 U.S. 685, 697 (2002), and since this is not a case where counsel entirely failed to request bond or entirely failed to file motions, *Cronic* does not apply to petitioner's situation; the general rule as articulated in *Strickland* applies; and petitioner is required to show prejudice.

Petitioner has not demonstrated that he would have been released on bond, had bail been set, or shown that counsel's failure to pursue bond had any effect on the ultimate judgment.[2] *See West v. Seabold*, 73 F.3d at 84. Likewise, Petitioner has not demonstrated that the filing of some unidentified pre-trial motion would have affected the ultimate judgment. Therefore, petitioner has failed to meet the prejudice prong of the *Strickland* test. The Tennessee appellate court did not render a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent and he is not entitled to relief with respect to the above claims of ineffective assistance of trial counsel.

###     ii.     Inadequate Trial Preparation (Petitioner's sub-issues 4, 5, 6, 12)

Petitioner's next four instances of alleged ineffective assistance of trial counsel are that counsel failed to consult with him (sub-issue 4); provide copies of documents he requested (sub-issue 5); maintain confidentiality during their meetings (sub-issue 6); and

---

[2]     The record reflects petitioner was indigent and his family was paying for trial counsel [Addendum No. 6, at 117-18]. Neither of petitioner's siblings testified they would have paid petitioner's bond.

understand the State's proof (sub-issue 12).[3]

The state appellate court resolved the claims as follows:

> Trial counsel testified that he would not refuse a client the right to obtain copies of any documents if a client wanted them. The petitioner also alleges that his trial counsel failed to maintain confidentially with the petitioner during his meetings. Because the petitioner testified that he did not have a memory of the offense due to his alleged intoxication, the post-conviction court found that "he didn't have much information to convey to counsel not having any memory" of the incident. Testimony reveals that the petitioner's trial counsel met with him on several occasions and under the best of circumstances provided in a confinement situation. Trial counsel conceded that the Unicoi County Jail attorney/client facilities were not optimal for meetings but testified that he would not allow officers or inmates to be within earshot of a meeting. The petitioner failed to present any evidence that he was prejudiced by his trial counsel's failure to provide him with any documentation or records. Furthermore, the petitioner failed to present testimony by fellow inmates or guards that could have demonstrated how he was prejudiced by meeting with his trial counsel in confinement. Lastly, the petitioner has failed to demonstrate how his trial counsel failed to understand his case. This issue is without merit.

*Harris v. State*, 2003 WL 22174293, at *7.

Petitioner again contends that the state courts' denial of relief on these claims is an unreasonable application of *Cronic*. However, as the Court found in the immediately preceding discussion, *Cronic* does not apply. This Court, as did the state court, will evaluate the claims under *Strickland*.

>***Inadequate Trial Preparation; Denial of Documents*: Petitioner is

---

[3]    The state appellate court construed the claim as follows: "The petitioner argues that because his trial counsel did not consult with him and failed to conduct a proper investigation, he did not fully understand the petitioner's case" *Harris v. State*, 2003 WL 22174293, at *7.

attacking trial counsel's alleged inadequate preparation, maintaining that counsel failed to consult properly with him in preparation for trial, but not alleging that counsel failed to communicate with him at all. Nor could he, given his own testimony during his state post-conviction hearing that counsel met with him "approximately four times" and that the meetings lasted five to twenty minutes [Addendum No. 6, Vol. III, at 21]. According to petitioner, they generally discussed counsel's investigation of the case, but not the specifics of his investigation [Addendum No. 6, Vol. III, at 22].

Trial counsel also testified during that hearing. Counsel stated that he met with petitioner several times; that they discussed mitigating the offense; that, while he does not give clients copies of documents routinely, he does provide documents to defendants upon their request; that he had no recollection of whether he provided petitioner with documents; and that, if petitioner had requested any documents, he was unaware of any such a request and could not imagine not providing documents to him,[Addendum No. 6, Vol. III, at 76].

Counsel met with petitioner at least four times in preparation for trial, and petitioner has demonstrated no prejudice as a result of counsel's failure to meet with him more often. Moreover, petitioner has failed to identify the documents he requested and has acknowledged that counsel gave a copy of the indictment. Once again, petitioner has not shown that he suffered any prejudice as a result of counsel's alleged failure to give him copies of the unidentified documents and the state court did not unreasonably apply *Strickland* in so finding.

***Breach of Confidentiality*: In this claim, petitioner contends trial counsel

failed to maintain confidentiality with him during their jail-house meetings. Petitioner testified that, when they met at the jail, "there was either a lot – they had inmates, or either got police officers, or sheriff's department. I never had one meeting with Bowman private." [Addendum No. 6, Vol. III, at 20]. Trial counsel did not recall the precise area in the jail where he met with petitioner but conceded that the facilities were not the best [Addendum No. 6, Vol. III, at 101]. However, counsel testified he would be mindful of the security of his conversation with his client and would not knowingly discuss confidential matters within the hearing distance of others (Addendum No. 6, Vol. III, at 78).

Petitioner has failed to provide any witness who overheard any confidential information discussed by him and his counsel or to demonstrate any prejudice as a result of the alleged lack of confidentiality. Accordingly, the state court did not unreasonably apply *Strickland* when it refused to grant petitioner relief on this claim based on its conclusion that he had offered no proof of prejudice. He, thus, is is not entitled to habeas corpus relief either.

***Lack of Understanding of the Proof*: As his last illustration of trial counsel's alleged ineffective assistance, petitioner contends that counsel failed to understand the State's proof. In support of this claim, petitioner cites to trial counsel's testimony that he did not think there was a witness who would have testified that petitioner was not intoxicated to some level: "I think it was universally conceded that he was – that he was intoxicated. You know, I guess, perhaps, the state's view was that he wasn't so intoxicated that he couldn't premeditate; but, I don't think - - I don't think there was a witness around

17

that would have testified that he wasn't intoxicated to some level" [Addendum No. 6, at 79].
Petitioner claims this testimony demonstrates that trial counsel failed to understand the
State's proof because there was testimony that he was calm, coherent, and sober soon after
the killing.

The Court does not agree. The record reflects that counsel's view of the testimony
is accurate. Trial counsel's reference to petitioner's intoxication was made in relation to the
time of commission of the crime, at approximately 8:52 p.m., and not in relation to the time
of his arrest, approximately three hours later, sometime after midnight [Addendum No. 1,
at 53-55]. Although there was testimony that petitioner did not appear to be "falling down
drunk" at the time of his arrest, the testimony of his drinking and smoking marijuana
throughout the day in question clearly demonstrates that he was intoxicated *to some extent*
at the time he committed the crime. True, there was conflicting evidence as to petitioner's
level of sobriety at the time he committed the crime and at the time of his arrest, but such
evidence does not demonstrate that trial counsel failed to understand the State's proof.
Rather, the evidence merely demonstrates that the defense's proof and theory of the case was
different than those of the State.

Additionally, this claim is undermined by counsel's cross-examination of the criminal
investigator in charge of investigating petitioner's crime. Although the investigating officer
testified that petitioner did not appear drunk, trial counsel effectively cross-examined him,
revealing that the officer had never arrested anyone for public drunkenness or for being under
the influence of intoxicants; that the officer's opportunity to observe petitioner and determine

his level of intoxication was hindered by the short time span in which he had contact with petitioner and by the circumstances of the arrest; and that the officer had no knowledge as to petitioner's level of intoxication some three hours prior to his arrest, when he committed the murder [Addendum No. 1, at 52-63]. The officer testified that he was aware petitioner had been drinking; that he was aware that another officer had seen marijuana, presumably at petitioner's trailer, on the day he committed the crime; and that he detected an odor of alcohol on petitioner and would have had him tested for alcohol and drugs, but decided against doing so because he did not want to take petitioner to the hospital since the victim's family was there [Addendum No. 1, 51-64]. Nothing before the Court indicates trial counsel misunderstood the State's proof or that, if he did, petitioner suffered any prejudice as a result of the alleged misunderstanding.

In sum, petitioner has not demonstrated how trial counsel's failure to consult with him more often; give him copies of documents; maintain confidentiality during their meetings; or understand the State's proof amounts to a deficient and prejudicial performance. Therefore, the state court's conclusion that these claims are without merit is not objectively unreasonable in light of the evidence, nor is it an unreasonable application of *Strickland.* The state court decision must remain undisturbed.

### iii.    Witnesses (Petitioner's sub-issues 8, 9, 11)

Petitioner contends that trial counsel failed to interview and call crucial witnesses in support of his defense (sub-issues 8, 9). Specifically, petitioner claims that his brother, Robert Harris ("Robert"), and sister, Deborah Simmons ("Ms. Simmons") should have been

interviewed and presented as defense witnesses and that trial counsel failed to employ expert assistance, who presumably, would have testified as a defense witness (sub-issue 11).

There is no right to call witnesses where the testimony would be irrelevant, repetitious, cumulative, or unnecessary. *Piggie v. Cotton*, 344 F.3d 675, 677 (7th Cir. 2003). An attorney, who is able to see and assess the likely demeanor and appearance of potential witnesses, is strongly presumed to have rendered a performance that falls within the wide range of reasonable professional judgment. Only where a petitioner shows that counsel's performance fell below an objective standard of reasonableness, resulting in prejudice, will ineffective assistance be found.. *Strickland*, 466 U.S. at 674. Complaints about uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy. *Coble v Dretke*, 444 F.3d. 345, 350 (5th Cir. 2006).

The claim involving counsel's alleged error in failing to secure an expert will be addressed first because it can be quickly dispatched.

***Employ an Expert*:  Petitioner alleges that his attorney should have hired an expert to assist the defense (sub-issue 11). Petitioner did not present any evidence at his post-conviction hearing to demonstrate that he was prejudiced by counsel's failure to obtain an expert. However, counsel testified that nothing during his contacts with petitioner and his family indicated a need for a mental health expert.[4]

---

[4]Although counsel observed that "you could assume that anybody that has drug and alcohol problems had - - probably has some mental and emotional problems[,]" he testified that there was nothing that suggested to him that petitioner was suffering from a mental illness that would raise an insanity defense [Addendum No. 6, at 86-88].

In reviewing this claim, the post-conviction court found that there was no evidence in the record to show that petitioner had any mental disease or defect that would have diminished his ability to act with the requisite intent. When this issue was raised on appeal, the state appellate court determined that petitioner had failed to present testimony from a mental health expert or a private investigator and that, thus, there was no evidence of any prejudice flowing from counsel's alleged shortcoming.

The statutory presumption of correctness, *see* 28 U.S.C. § 2254(e)(1), extends to factual findings made by state appellate courts based on their review of trial court records. *Brumley v. Winard*, 269 F.3d 629, 637 (6th Cir. 2001) (citing *Sumner v. Matta*, 449 U.S. 539, 546-47 (1981)). The Court of Criminal Appeals concluded, from its review of the record, that petitioner had failed to offer the testimony of a mental health expert or investigator (presumably for the purpose of outlining the proof the expert(s) would have discovered and presented) to enable the trial court to determine the potential merit of any such evidence. The state appellate court's no-evidence determination constitutes a finding of fact, which, absent clear and convincing contrary proof, must be presumed correct.

Affording the presumption to the state court's finding of "no-evidence" necessarily results in the conclusion that, without evidence to show the prejudice ensuing from the alleged deficiency, petitioner cannot prevail on this claim of attorney error. It, therefore, follows that the state court's decision, rejecting the claim, was not based on an unreasonable determination of the facts presented or an unreasonable application of *Strickland*. The writ will not issue with respect to this claim.

***Robert Harris:*: During petitioner's state post-conviction hearing, his older brother, Robert, testified that he was summoned to coax petitioner out from under the mobile home after the murder was committed. Robert "went to the trailer and hollered in there four or five times, and - - and a minute or two while [Robert] was still there [he saw] a couple of these deputies or so run around the end. And by the time that [Robert] got around there where it was Roger had already come out, and they had him handcuffed." [Addendum No. 6, Vol III, at 58-59]. Robert testified that he was four or five feet from petitioner, who looked "awful scared, and awful wild looking." Upon further questioning, Robert opined that petitioner looked either drunk or "doped out his mind" [Addendum No. 6, Vol. III, at 60]. Robert testified that he was never interviewed by petitioner's trial counsel and, although he would have been willing to testify if he had been asked or subpoenaed, he never spoke to trial counsel. On cross examination Robert explained that he stayed away from petitioner's trial because he himself had been in trouble and because his attorney instructed him to stay away from the trial [Addendum No. 6, Vol. III, at 63-64].

When this claim was offered to the state post conviction court, it found that Robert's testimony, although relevant, would have been subject to attack on the issue of bias. *Harris v. State*, 2003 WL 23174293, at *8. Concluding that there was overwhelming proof that petitioner was capable of functioning and forming the requisite *mens rea* to commit the offense, the state post-conviction court found that he had failed to prove that the failure to call this witness constituted ineffective assistance.

***Deborah Simmons*: Ms. Simmons, petitioner's sister, testified during his

state post-conviction trial that she had never discussed, and trial counsel had never asked her about, her knowledge of any facts pertaining to petitioner's case. Although she hired trial counsel and had the most substantial contact with trial counsel, Ms. Simmons never informed counsel that a law enforcement officer had told her that "all the witnesses stated that Roger was drunk and messed up, said he was out of his mind," not even after she heard the same law enforcement officer testify that petitioner "was straight,"[5] [Addendum No. 6, Vol. III, at 68-72].

In resolving this claim, the post-conviction court observed that the only way Ms. Simmons' testimony would have come out would have been for her to be in the courtroom when the law enforcement officer testified and that, had she been in the courtroom, she would not have been able to testify because of the rule excluding witnesses from a trial prior to their testimony. The state post-conviction court determined that counsel's failure to

---

[5] Petitioner's jury trial lasted three days, and the criminal investigator, to whom Ms. Simmons refers, testified on the first day of trial. The record shows, however that this officer did *not* testify that petitioner "was straight" [Addendum No. 1, at 12-70]. Rather, he testified that, based on his 30- to 60-second observation of petitioner after he was arrested (while he was on the ground and as he was escorted to a police vehicle), that he detected an odor of alcohol on petitioner but that he did not "appear to be intoxicated....seemed to have his senses about him ... was excited ... or scared or whatever – but, he didn't appear drunk.... I would not have arrested him for being drunk." [Addendum No. 1, at 51]. On cross-examination, the officer acknowledged that witnesses had reported that petitioner had been drinking but not that petitioner had been smoking marijuana, though one officer had said that they had some marijuana "over there." [Addendum No. 1, at 52].

Ms. Simmons testified she heard the investigator's testimony that petitioner was "straight" but could not jump up during court and say anything so she just sat in court and kept her mouth shut [Addendum No. 6, Vol. III, at 69]. Curiously, she waited years to reveal this evidence rather than notifying trial counsel at the time of trial, that, in her opinion, the criminal investigator's testimony was not consistent with the conversation she had with him.

interview Ms. Simmons did not constitute ineffective assistance and, that furthermore, due to overwhelming proof of petitioner's capacity to function and form the requisite intent to commit the crime and evidence that he was not in an alcoholic haze at the time of the shooting, no prejudice had resulted from that failure. The trial court's decision was upheld on appeal.

At the outset, it is important to note that petitioner's brother had no knowledge of petitioner's condition at the time he committed the crime—but only of his condition, briefly observed, at the time of petitioner's arrest.[6] Moreover, the only helpful evidence presented by petitioner's brother was that, immediately after his arrest, petitioner looked scared, wild, drunk, "doped out of his mind," or something [Addendum No. 6, Vol. III, at 60].

A review of that proof demonstrates petitioner cannot show counsel's failure to interview and present his siblings as witnesses had any effect on the ultimate judgment.

Don Whitson ("Whitson"), criminal investigator for the Unicoi County Sheriff's Department, testified that, although petitioner did not appear intoxicated or drunk when he was arrested, he had an odor of alcohol about him; that he was excited or scared [Addendum No. 1, at 51]; that he seemed to have his senses about him and was not "falling down" drunk; that his speech was not impaired; that he answered questions appropriately. However, Whitson also acknowledged that he only had approximately one minute of contact with

---

[6]     The evidence reflects that petitioner was arrested after midnight and it appears that he last ingested an intoxicant between 6:15 p.m. and 7:30 p.m.[Addendum No. 1, Vol. III, at 273-75].

petitioner at the time of his arrest, while petitioner either was on the ground being handcuffed or was being escorted to a patrol car; that he had contemplated taking petitioner to the hospital for a blood test to screen for alcohol and/or drugs, but did not do so because the victim's family was at the hospital and he did not want to create any problems; and that he was unaware of petitioner's condition three or four hours earlier, at the time of the shooting. Whitson added that other witnesses had said petitioner had been drinking and that an officer had said he saw some marijuana "over there." [Addendum No. 1, at 51-68, Whitson testimony].

An officer testified that he was called to petitioner's residence earlier in the day, at approximately 5:30 p.m., to keep the peace while petitioner's girlfriend retrieved some of her belongings, and that petitioner "appeared to have been drinking but he didn't appear to be drunk"[Addendum No. 1, at 131-25]. Two other officers who arrived at the scene after petitioner was handcuffed also testified—one stated that petitioner appeared scared and the second stated that he detected an odor of alcohol and observed empty beer bottles but did not believe petitioner was drunk. The second officer further stated that he had transported petitioner to jail after the arrest and that nothing in petitioner's demeanor or speech made him conclude petitioner was drunk or intoxicated [*Id.*, at 126-128, 138-43].

Mr. Metcalf ("Metcalf"), one of petitioner's neighbors, was with him the day of the shooting and he observed petitioner drinking beer, beginning at approximately 8:30 in the morning. Metcalf saw petitioner buy a nickle bag of marijuana, which they smoked together. Metcalf was with petitioner until approximately 1 p.m. that afternoon and, during that time,

they and at least one other friend shared two marijuana cigarettes and drank almost a half case of beer.  While they were together, Metcalf was concerned because of petitioner's erratic driving and slurred speech. When he saw petitioner after the shooting, petitioner appeared calm and collected.  In addition, petitioner admitted emptying his gun into the victim [*Id*., at 148-204].

Steve Lewis ("Lewis"), petitioner's friend and neighbor, testified as a witness for the State.  Lewis testified that petitioner was upset on December 22, 1990, when he arrived at his trailer early in the morning.   Petitioner invited Lewis to drink beer with him and Metcalf.  Lewis said petitioner was slurring his speech when he picked him up.  They drove to Jerry Price's house and drank three or four beers and smoked a marijuana cigarette.  They left Price's house and drove to Rendevous[7] but since Lewis had been barred from the establishment, he stayed in the car until he got a ride home from a friend.

Later that afternoon, Lewis saw Metcalf and petitioner arrive at petitioner's trailer with a case of 12-ounce bottles of Budweiser.  Lewis joined petitioner at his trailer and they began drinking beer.  Metcalf left after a few minutes, but Lewis and petitioner continued to drink beer and smoke marijuana.  Lewis testified that, although petitioner was not falling down drunk, he was intoxicated to the extent that he should not have been driving.  They smoked their last marijuana cigarette about 7:30 p.m. (smoking a total of five cigarettes that day) [*Id.*, at 277-79].

---

[7]     Although not described in the state court proceeding, the record indicates this is an establishment that sells beer.

Soon thereafter, petitioner began shooting beer bottles in his trailer and, as Lewis got up, a bullet accidently hit him in the heel. Lewis went home after getting shot, and his mother called an ambulance to take him to the hospital. While he was at the hospital, the victim was brought in and pronounced dead.

After Lewis returned home, petitioner came to Lewis' trailer and told him that he had shot the victim nine times. Lewis described petitioner's demeanor as calm and his speech as understandable [*Id.*, at 238]. While petitioner and Lewis were talking, officers pulled into the mobile home park and petitioner hid under the trailer. Lewis eventually told the officers that petitioner was hiding under Lewis' trailer with a loaded weapon [*Id.*, at 204-286].

Jeanene Pate Edwards ("Edwards"), petitioner's ex-girlfriend and Lewis' first cousin, testified that petitioner was high and that she could tell he had been drinking when she was at his trailer getting her belongings that afternoon at approximately 5:30 p.m., but that he neither appeared drunk nor high that evening about 8:00 p.m., when he shot the victim [*Id.*, at 298-343].

Edwards' sister and brother-in-law also testified. They saw petitioner several times on December 22, 1990. Petitioner came to their house that morning and they were with Edwards when she went to petitioner's trailer to pick up her belongings. In addition, they were present when petitioner shot the victim. Edwards' sister, Teresa Brackins, did not testify that petitioner was drunk or high [*Id.*, at 360-394].

Edwards' brother-in-law, Tommy Brackins ("Brackins") added further details in his testimony. He stated that he had seen petitioner drunk the night before the killing and that

petitioner came to his residence a couple of times the morning of December 22, 1990, looking for Edwards. The second time he came, about 10:30 a.m., Brackins gave petitioner a beer and he showed Brackins a .22 pistol. While talking with Brackins, petitioner drank a total of three beers in less than an hour. Later that afternoon, between 5:00 p.m. and 5:30 p.m., petitioner returned to Brackins' residence and asked him to get Edwards and to bring her to his trailer, so that she could get her belongings. Brackins testified petitioner may have been a little high, but was not drunk; rather, he was upset about Edwards leaving him [*Id.*, at 396-444].

Petitioner testified in his own defense. Although he stated that he had no memory of the offense because of his intoxication, petitioner remembered his actions prior to the killing. Petitioner testified that he woke up the morning of December 22, 1990, to discover that Edwards had not returned from her previous night out. He smoked a couple of marijuana cigarettess and drank a couple of beers before going to look for Edwards at the Brackens' home. After learning that Edwards' brother-in-law did not know where she was, petitioner returned to his trailer and drank a couple of more beers. Later, petitioner and Metcalf were driving around and petitioner saw his vehicle at the victim's residence. The victim told petitioner he did not know where Edwards was, so petitioner took the vehicle; went home; took some pills--"percoset or percodane;" drank a couple of more beers; and took some LSD 25 [*Id.*, at 445-455]. Petitioner testified that he recalled getting together with Metcalf and Lewis; picking up some beer; and "going back towards Canah Chapel;" but remembered nothing after that [*Id.*, at 455].

28

Petitioner's complaint that counsel failed to interview and call his siblings as witnesses provides no grounds for habeas relief. This is so because the evidence they would have offered, in view of the overwhelming evidence that he was intoxicated to some extent, does not demonstrate that their absence caused petitioner to lose what he otherwise probably would have won. *United States v. Morrow*, 977 F.2d at 229. Petitioner's brother, Robert, would have testified petitioner looked wild, but that evidence is repetitive since the arresting officers provided the same testimony. In addition, the testimony Robert would have offered, that he "looked like he was either drunk or doped out of his mind," was not supported by any factual description of his demeanor, movement, or speech but was based on petitioner's appearance, viewed for "a moment or so" [Addendum No. 6, at 59-61]. Moreover, Robert's testimony describes petitioner at the time of his arrest—not at the time he committed the crime.

Also, the jury had before it a great deal of testimony relative to petitioner being under the influence of drugs and alcohol. Although Robert's testimony would have supported his defense, the Court does not find that it would have provided a viable defense or that there is a reasonable probability the result of the trial would have been different had it been presented. *See Lynott v. Story*, 929 F.2d at 232. The testimony presented at trial revealed that petitioner was intoxicated to some extent when he committed the murder and counsel testified, at the post-conviction hearing, that he did not believe there was any serious contest that petitioner was under the influence [Addendum No. 6, at 84]. In addition, trial counsel was never questioned as to why he failed to interview Robert or present him as a witness.

Thus, it was not unreasonable for the state trial court to find that Robert's testimony, while relevant, would have been vulnerable to an attack based on bias.

However, assuming that counsel's performance was deficient in this instance, petitioner cannot demonstrate that he suffered any prejudice because evidence that petitioner was, in fact, under the influence of marijuana and alcohol to some extent was presented in the State's case in chief, by non-family members, and because petitioner himself testified that, in addition to drinking beer and smoking marijuana, he took prescription drugs and LSD. In light of all of the proof regarding petitioner's intoxication, Robert's testimony about petitioner's appearance at the time of his arrest does not establish that, had this witness been presented, there is a reasonable probability that the outcome of the trial would have been different.

As to the testimony of Ms. Simmons, petitioner's sister, that Officer Whitson told her that the witnesses stated petitioner was drunk, messed up, and out of his mind, it is interesting that she did not offer that information during one of her numerous conversations with counsel, though counsel testified that she kept in close contact with him [Addendum No. 6, at 77]. In addition, it appears that trial counsel interviewed Ms. Simmons, who was "very involved in the case, and was very helpful," [Addendum No. 6, at 94-95], but that counsel was never asked specifically, during the post-conviction hearing, about the details of that interview or whether he asked her what she knew about the case. Be that as it may, the record does not demonstrate that Whitson denied making such a statement or that offering Ms. Simmons' testimony as to that conversation would have impacted the ultimate judgment.

Thus, no showing of prejudice has been made.

Given the testimony presented at trial as to petitioner's intoxication, as well as Robert's likely impeachment on the basis of bias, had he testified on his brother's behalf, the state court's conclusion (i.e., that counsel's failure to interview and present Robert and Ms. Simmons as defense witnesses was not ineffective assistance of counsel) was neither based on an unreasonable determination of the facts nor an unreasonable application of *Strickland*, and the state court's decision to that effect was not contrary or an unreasonable application of Supreme Court precedent. *See Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005) (finding that counsel is not ineffective for failing to call additional witnesses to present evidence that is "merely cumulative" to that presented at trial).

### iv. Unconstitutional Amendment to Indictment (Petitioner's sub-issue 10)

During jury selection, the state made a motion to add the word "intentionally" to Count One of the indictment.[8]  Trial counsel stated that it was a technical addition and that he had no objection to the amendment [Addendum No. 6, at Exhibit 12, p. 15].  Petitioner claims counsel was ineffective for permitting the indictment to be amended.

At the post-conviction hearing, trial counsel testified that, had he objected, the state, undoubtedly, would have obtained a continuance and the grand jury would have reconvened

---

[8]    The pre-amendment indictment charged that the petitioner:

did unlawfully, deliberately and with premeditation kill Jeff Higgins in violation of Section 39-13-202, Tennessee Code Annotated and against the peach and dignity of the State of Tennessee."

and issued an indictment with the word "intentionally"included in Count One. In addition, the indictment included the applicable statute and trial counsel testified that he "understood that [petitioner] was charged with first degree murder" [Addendum No. 6, Vol. III, at 83]. The post-conviction court ruled that trial counsel's decision not to object to the amendment did not constitute ineffective assistance of counsel.

When the issue was offered to the state appellate court, it observed that state law permits the amendment of an indictment in all cases, with the defendant's consent, before jeopardy attaches, if no additional or different offense is charged and no substantial rights of the defendant are prejudiced. In addition, the appellate court noted "that an indictment is valid if it provides sufficient information to enable the accused to know the accusation to be answered, to furnish the court with an adequate basis for proper entry of judgment, and to protect the accused from double jeopardy." *Harris v. State*, 2003 WL 22174293, at *8 (citing *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997)).[9] The appellate court concluded that "[i]n light of the overwhelming evidence against the petitioner, he has failed to demonstrate prejudice caused by the wording of the indictment." *Id.*.

First, the Court observes that the indictment included the proper statutory reference which put petitioner on notice as to the accusation he was required to answer. Second, the grand jury considered the first degree murder statute which included the intentional element in its definition. Third, based on the overwhelming proof of petitioner's threats against the

---

[9] Petitioner was convicted of the same crime for which he was indicted: first-degree murder.

victim prior to the shooting, there is no doubt the grand jury would have re-indicted him with the additional word;[10] thus, he has failed to demonstrate that he was prejudiced by counsel's decision not to object to amending the indictment with the word "intentional." And lastly, petitioner has failed to demonstrate that the state court's decision (i.e., that counsel did not render ineffective assistance by agreeing to the amendment) was legally or factually unreasonable. Accordingly, because the decision of the Tennessee Court of Criminal Appeals was not contrary to, or an unreasonable application of *Strickland*, or based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing, petitioner cannot be granted § 2254 relief on his claim.

### 2. Appellate Counsel

#### a. The Bail-Related Issue (Petitioner's sub-issue 3)

There is one remaining claim involving petitioner's bail. He charges that counsel failed to seek review, at the appellate court level, of the trial court's denial of bail. Because the Court already has concluded, as did the state court, that petitioner has shown no prejudice as a result of counsel's claimed error, the state court's determination that counsel did not

---

[10] This is the proof which would have demonstrated that petitioner intentionally and with premeditation murdered the victim. Petitioner indicated that removing the victim's dog from the victim's premises would prevent the victim from knowing he was on his property; he placed the victim's dog in his vehicle and drove a distance away from the premises before putting the dog out; and, earlier that day, he stated, on several occasions, that he was going to shoot the victim [Addendum No. 6, at 158, 167, 186-89, 220-22]. In addition, each time petitioner went to the victim's house after realizing that his girlfriend had left him for the victim, he was carrying a weapon. This overwhelming evidence of intent shows that, had his case been re-submitted to the grand jury with the word intentionally added, petitioner would have been re-indicted for first degree murder

render ineffective assistance by failing to litigate this issue on appeal is not an unreasonable application of *Strickland* nor based on an unreasonable conclusion as to the facts.

### b. The *Brown* Decision

Petitioner challenges appellate counsel's failure to file the decision of *State v. Brown*, 836 S.W.2d 530 (Tenn. 1992), as supplemental authority while his direct appeal was pending and for failing to file a petition to rehear based on *Brown*.[11] The state appellate court determined that neither action would have entitled petitioner to any relief.

On direct review the state appellate court specifically determined the jury instructions were proper and "in line with our Supreme Court's recent landmark pronouncement on the very subject.." *State v. Harris,* 1992 WL 171368 (Tenn.Crim.App. 1992) (citing *Brown*). In addition, petitioner raised this ruling regarding the jury instruction, as the sole issue in his delayed application for permission to appeal the appellate court's decision. The Tennessee Supreme court denied his application.

Petitioner argues that the trial court's jury instruction that "intent or design to kill maybe conceived and deliberately formed in an instant[,]" violated the Tennessee Supreme Court's subsequent decision in *Brown.* Petitioner is claiming that this state law violation provides him habeas relief. This Court does not have the authority to review the state court decision on matters of state law. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991) ("As we

---

[11]   In *Brown*, the Tennessee Supreme Court concluded "that it is prudent to abandon an instruction that tells the jury that 'premeditation may be formed in an instant" *Id.* at 543. *Brown* was issued seven weeks before the state appellate court decided petitioner's appeal.

have stated above, however, the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."); *Gall v. Parker*, 231 F.3d 265, 303 (6th Cir. 2000)("Principles of comity and finality ... command that a habeas court cannot revisit a state court's interpretation of state law, and in particular, instruct that a habeas court accept the interpretation of state law by the highest state court on a petitioner's direct appeal"), *overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003). However, assuming that this claim is properly before the Court, it is without merit as petitioner has not shown a constitutional violation.

"Errors in jury instructions must be so egregious that they render the entire trial fundamentally unfair." *White v. Mitchell*, 431 F.3d 517 (6th Cir. 2005), *cert denied*, 127 S.Ct. 581 (2006). "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Cupp v. Naughten*, 414 U. S. 141, 147 (1973). An improper jury instruction violates a defendant's constitutional rights if the instruction "by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

Although the instant jury charge did contain a statement indicating that the "intent or design to kill maybe conceived and deliberately formed in an instant," the jury instructions,

considered in their entirety, sufficiently and explicitly convey the principle that petitioner's mental state, at the time of the crime, must have been the result of reflection and judgment and free from excitement and passion for the petitioner to be capable of premeditation [Addendum No. 1, at 517-518]. Petitioner has not directed the Court's attention to any Supreme Court case, nor has the Court found such a case in its research, which demonstrates that the instruction did not comply with constitutional principles. The jury instructions given by the trial judge in petitioner's case sufficiently informed the jury of their constitutional duty to consider whether the homicide committed by petitioner was accompanied by the premeditation and deliberation necessary to convert the killing into first-degree murder.

To establish that counsel was ineffective for failing to supplement his appeal with the *Brown* case, petitioner must demonstrate that he was prejudiced by this alleged deficiency. However, the state court decisions demonstrate petitioner would not have prevailed even if counsel had supplemented the direct appeal with *Brown*.[12] Consequently, absent evidence that this instruction was so prejudicial that it negatively affected the outcome of the trial, petitioner has failed to demonstrate appellate counsel was ineffective for failing to supplement his direct appeal with the *Brown* case and for failing to file a motion to rehear based on the *Brown* case.

In light of the state court decisions concluding that the application of *Brown* to the

---

[12]    As noted earlier, on direct appeal the appellate court concluded that the jury instructions on premeditation and deliberation were proper, even under the then new decision of *Brown*. The Tennessee Supreme Court denied petitioner's delayed application for permission to appeal which raised the sole issue of the appellate's court's ruling regarding the jury instruction issue. *See Harris v. State,* 2003 WL 22174293, at *9.

instant jury instructions affords petitioner no relief; the rule that federal habeas corpus courts may not grant relief on a jury-instruction claim simply because the instruction may have been deficient under state law, *Estelle v McGurire*, 502 U.S. 62, 72 (1991); and petitioner's failure to demonstrate that the instruction negatively affected the outcome of his trial, he cannot prove that there is a reasonable probability that, but for counsel's alleged errors, the outcome of his appeal would have been different. Therefore, the Court of Criminal Appeals' determination that appellate counsel's representation was not deficient for failing to raise *Brown* at some stage of the process was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, habeas corpus relief cannot be granted on this claim.

Likewise, petitioner's claim that counsel was ineffective for failing to file properly an application for permission to appeal his conviction to the Tennessee Supreme Court, is without merit. Petitioner was granted a delayed direct appeal and, consequently, is unable to demonstrate prejudice as required under *Strickland.*

### 3. Jury Instruction

The trial court instructed that "[a] premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. Such intent or design to kill maybe conceived and deliberately formed in an instant." [Addendum No. 1 cont., at 518]. Petitioner charges that the jury instruction that premeditation may be formed in an instant violates due process of law.

Petitioner has not directed the Court's attention to, nor has the Court found during its

research, any Supreme Court case which teaches that such an instruction violates due process of law. Nevertheless, the Court previously determined that this alleged erroneous jury instruction did not have a substantial and injurious effect on the jury's verdict. In this claim, as in the earlier one, *see* Section 2, *supra*, habeas relief is not available for petitioner because he has failed to establish that the jury instruction was erroneous or that it had a substantial and injurious effect on the jury's verdict.

### 4. Unconstitutional Amendment

The indictment originally charged that petitioner unlawfully, deliberately, and with premeditation killed Jeff Higgins in violation of Section 39-13-202[13] of the Tennessee Code Annotated [Addendum No. 1, at 1-2]. Petitioner claims his conviction was obtained by an unconstitutional amendment, when the word "intentionally" was added, with his counsel's consent. As the Court previously explained, given his counsel's agreement to the addition, the indictment was properly amended.

In any event, the Sixth Circuit has instructed that "[a]n indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986). The unamended indictment, which included the statute, fairly charged petitioner with the premeditated and intentional killing of the victim and, thus, adequately informed petitioner of the crime charged in sufficient detail so as to enable him to prepare

---

[13] The statute identifies first degree murder as a premeditated and intentional killing.

a defense.  Thus, his claim does not give rise to a constitutional issue cognizable in habeas

corpus proceedings, but if it does, the addition of the word "intentionally" did not violate the

Constitution.

Therefore, the Tennessee court's rejection of his claim was neither contrary to nor

an unreasonable application of clearly established Federal law.  Habeas relief is not

warranted with respect to this claim.

## V.    CONCLUSION

Respondent's motion for summary judgment [Court File No. 7] will be **GRANTED**

as to all claims.  Petitioner is not entitled to an evidentiary hearing, and his § 2254 petition

[Court File No. 1] will be **DISMISSED**.

A separate judgment order will enter.

**ENTER**:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
